# IN THE UNITED STATES DISTRCT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

ELKHART WATERSPORTS ALLIANCE, INC
PO Box 182
Elkhart Lake, WI 53020

                      Plaintiff,

                                     Case No. 2:26-cv-00682

v.

VILLAGE OF ELKHART LAKE
40 Pine Street
Elkhart Lake, WI 53020

Lynn Shovan
(In her official capacity as the
Village President and Trustee)
264 E. Maple St.
P.O. Box 682
Elkhart Lake, WI 53020

John Schott
(In his official capacity as a
Village Trustee)
913 Grassy Lane
P.O. Box 566
Elkhart Lake, WI 53020

Geoff Bray
(In his official capacity as a
Village Trustee)
320 N. Turtle Bay Rd
P.O. Box 736
Elkhart Lake, WI 53020

Terri Knowles
(In her official capacity as a
Village Trustee)
161 S. East St.
P.O. Box 35
Elkhart Lake, WI 53020

1

Paul Rudnick
(In his official capacity as a
Village Trustee)
351 E. Rhine St.
Elkhart Lake, WI 53020

Mark Landgraf
(In his official capacity as a
Village Trustee)
106 S. Lake St.
Elkhart Lake, WI 53020

Mike Wolf
(In his official capacity as a
Village Trustee)
601 Autumn Drive
Elkhart Lake, WI 53020

                              Defendants.

---

## COMPLAINT

---

Plaintiff Elkhart Watersports Alliance, Inc., by its attorneys Weld Riley, S.C., hereby brings this Complaint against the Village of Elkhart Lake:

### INTRODUCTION

1. This action seeks a declaratory judgment that an ordinance attempting to completely ban wake surfing on Elkhart Lake, Sheboygan County, is illegal and unconstitutional.

2. This action also seeks injunctive relief, enjoining Defendants and any of its officers or other officials from attempting to enforce the vague, overbroad, and illegal ordinance.

### PARTIES

3. Plaintiff, Elkhart Watersports Alliance, Inc., ("EWA") is a nonstock, nonprofit corporation formed under Chapter 181, Wis. Stats., whose principal office is located at PO Box 182, Elkhart Lake, Wisconsin 53020. The registered agent's office is located at 3624 Oakwood Hills Parkway, Eau Claire, Wisconsin 54701.

2

4. EWA is a boating organization, as that term is defined in Wis. Stat. § 30.77(3)(dm)1.a., whose primary purpose is to support, protect, and promote boating activities on the waterways in the Village of Elkhart Lake and the Town of Rhine, Sheboygan County, Wisconsin. Such waterways include, but are not limited to, Elkhart Lake, and such boating activities it seeks to support, protect and promote include wake surfing on Elkhart Lake.

5. EWA is a membership organization comprised primarily of riparian landowners who own boats and/or property on Elkhart Lake in the Village of Elkhart Lake and the Town of Rhine, Sheboygan County, Wisconsin.

6. Defendant, the Village of Elkhart Lake is a local government unit and municipality organized and existing under ch. 61, Wis. Stats., and is located in Sheboygan County, Wisconsin. The Village's principal place of business and mailing address is 40 Pine Street, Elkhart Lake, Wisconsin 53020.

7. Defendant, Lynn Shovan ("Shovan"), is being sued in her official capacity as the Village President, who is a Trustee on the Village Board of Trustees.  Shovan is an adult resident of the State of Wisconsin and resides at 264 East Maple Street, Elkhart Lake, Wisconsin 53020.

8. Defendant, John Schott ("Schott"), is being sued in his official capacity as a Trustee on the Village Board of Trustees.  Schott is an adult resident of the State of Wisconsin and resides at 913 Grassy Lane, Elkhart Lake, Wisconsin 53020.

9. Defendant, Geoff Bray ("Bray"), is being sued in his official capacity as a Trustee on the Village Board of Trustees.  Bray is an adult resident of the State of Wisconsin and resides at 320 North Turtle Bay Road, Elkhart Lake, Wisconsin 53020.

3

10. Defendant, Terri Knowles ("Knowles"), is being sued in her official capacity as a Trustee on the Village Board of Trustees. Knowles is an adult resident of the State of Wisconsin and resides at 161 South East Street, Elkhart Lake, Wisconsin 53020.

11. Defendant, Paul Rudnick ("Rudnick"), is being sued in his official capacity as a Trustee on the Village Board of Trustees. Rudnick is an adult resident of the State of Wisconsin and resides at 351 East Rhine Street, Elkhart Lake, Wisconsin 53020.

12. Defendant, Mark Landgraf ("Landgraf"), is being sued in his official capacity as a Trustee on the Village Board of Trustees. Landgraf is an adult resident of the State of Wisconsin and resides at 106 South Lake Street, Elkhart Lake, Wisconsin 53020.

13. Defendant, Mike Wolf ("Wolf"), is being sued in his official capacity as a Trustee on the Village Board of Trustees. Upon information and belief Wolf is an adult resident of the State of Wisconsin and resides at 601 Autumn Drive, Elkhart Lake, Wisconsin 53020

## JURISDICTION AND VENUE

14. This Court has original jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because Plaintiff's action arises under the Fourteenth Amendment to the United States Constitution; and under federal law, particularly the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988; and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

15. This Court has authority to issue the requested declaratory relief pursuant to 28 U.S.C. § 2201 and 2202, the requested injunctive relief under 28 U.S.C. § 1343, and reasonable attorneys fees and costs under 42 U.S.C. § 1988.

16. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the claims arising under the laws of the State of Wisconsin, as those claims are so related to the claims

4

in this action in which the Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

17. This court has personal jurisdiction over all Defendants because all Defendants reside or the principal office is located in the Eastern District of Wisconsin.

18. Venue in the Eastern District of Wisconsin is proper because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of Wisconsin and Defendants reside in or principal office is in the Eastern District of Wisconsin.

## GENERAL ALLEGATIONS

19. Plaintiff realleges all prior allegations.

### Notice of Claim and Claim Disallowance

20. On November 17, 2025, all Defendants except Defendant Shovan were personally served a Notice of Circumstances Giving Rise to Claim and Claim Pursuant to Wis. Stat. § 893.80 ("Notice of Claim"), with the above-named Plaintiff named as the Claimant.

21. On December 23, 2025, Defendant Shovan was personally served the Notice of Claim, with the above-named Plaintiff named as the Claimant.

22. Defendants enacted "Resolution Three-2026" on March 9, 2026, but failed to list that Resolution on the Village Board meeting agenda for the March 9, 2026 meeting, potentially in violation of Wisconsin's Open Meetings Law.

23. Consistent with Wis. Stat. § 893.80, Plaintiff has timely brought this Complaint against the Defendant.

5

<u>Ordinance and Its Adoption</u>

24.     At its regular Village Board meeting on November 3, 2025 ("November 3 Meeting"), the Village, through its Village Board of Trustees, enacted Ordinance No. 669 ("Ordinance").  A copy of the Ordinance as adopted is attached as <u>Exhibit A</u> to this Notice.

25.     All Defendant Village Trustees voted in favor of the Ordinance.

26.     The Ordinance does not restrict wake surfing to limited areas of Elkhart Lake, such as the deepest areas of the lake or certain setbacks from the shoreline around the lake. The Ordinance also does not simply restrict hours of wake surfing on Elkhart Lake. Nor does the Ordinance limit wake surfing to certain days of the week. The Ordinance goes further.

27.     The Ordinance attempts to ***completely prohibit*** wake surfing on Elkhart Lake. In effect, this ban targets and attempts to ban a specific type of boat, a type of boat known as a "wake boat."

28.     That is, instead of reasonable "restrictions," the character of the Village's actions is ***the most extreme action*** a government can take – a ***complete prohibition*** – on something which has been legal for decades on Elkhart Lake and which is in excess of the Village's authority under Wis. Stat. § 30.77.

29.     The Village may attempt to claim that wake boats are not targeted and banned, but the Village Trustee actively pushing for the Ordinance – John Schott – who has coordinated efforts with the Town of Rhine and an outside special interest advocacy group, while also leading efforts as the President of the local lake association to support a ban, said the Ordinance is intended to eliminate wake boats and wake surfing.

30.     In a March 6, 2025 email to a conservancy group, Trustee Schott clearly and unequivocally stated, the Ordinance is "***<u>an ordinance eliminating wake boats/wake surfing from</u>***

*Elkhart.*" (emphasis added). Schott could not be clearer in what this Ordinance targets and intends to eliminate – wake boats and wake surfing. (Trustee Schott did not speak at the November 3 Meeting to dispel or otherwise contradict this stated intent.)

31. On March 3, 2025, in another email to a different outside special interest advocacy group, which the Trustee solicited to draft the so-called "condition report," the Village Trustee characterized the Ordinance as having the following intent: "If the recommendation from the committee is to proceed with the Crystal Lake ordinance/***banning of wake boats***, we would plan on submitting the proposed ordinance and the Condition Report following the April 3rd meeting to the DNR for their review and comment." (emphasis added). A Town of Rhine Supervisor replied to that Village Trustee's email describing the Ordinance, stating, "Nice job."

32. In another email, that same Village Trustee (and consistent with the above-referenced emails regarding the intent that the Ordinance would be "an ordinance eliminating wake boats"), revealed his true intentions and preference to ban the boat, not just the activity, "I think most people would prefer ***not to have wake boats at all* . . .**"

33. In previous years, Defendant Schott made clear his intent was banning wake boats from Elkhart Lake. In November 14, 2023 email to Sheboygan County Planning & Conservation Director Aaron Brault, Schott asked, "What about ***not allowing wake boats*** to be put-ons because they carry water from previous 'outings' in their ballast tanks?" Brault replied minutes later, that perhaps Schott had "found a loophole." Schott then replied minutes later that "The potential loophole causes other questions – what about boats resident on the lake?", implicitly recognizing that riparian owners have riparian rights to recreate on the water with their boats.

7

34.     During the November 3 Meeting, Village Trustee Geoff Bray stated during the November 3 Meeting: "***We do not have control of how many boats are on the lake. We do not have that right now.***"

35.     The Village Trustees' clearly-stated intent is contrary to Wisconsin law's legal limits. The Ordinance's goal and intent is to impermissibly "exclude" a particular type of boat "from the free use of the waters of this state." Wis. Stat. § 30.77(1)(b).

36.     Not only is the Village's intent to ban a particular boat illegal, but the process used to adopt the Ordinance was also suspect and instead looked for ways to "short circuit" the process.

37.     At a Village Board meeting before the third reading of the Ordinance at the November 3 Meeting, Defendant Terri Knowles said, "We're not going to be having our discussion as the Board probably until the third reading. I'm just wondering ***if we can short circuit that somehow***?"

38.     During the Board's minimal discussion of the Ordinance during its November 3 Meeting, among other deficiencies in the Board's discussion, there was no discussion regarding the specific amount, type and speed of boating traffic on Elkhart Lake and any documented or specific boating safety and congestion issues.

39.     Upon information and belief, the decision to enact the Ordinance also appears to be pre-determined and discussed outside of properly noticed meetings. For example, as part of the packet for a February 13, 2025 meeting of the Village's Protection of Person & Property Committee meeting, a Village Trustee provided information in the packet outlining the process for passing the Ordinance, which stated, "***the Town has <u>already said</u> they would go along with whatever <u>we decided</u>***."

40.     Prior to that February 13 communication, Defendant Schott and two members of the Town of Rhine Board of Supervisors (Bill Jacob and Jon Rost) coordinated a secret lunch meeting to discuss the Ordinance, as set forth below:



41.     As the Village Trustee said it would occur based on what had been "decided" (the Trustee's brother-in-law is on the Board of Supervisors for the Town of Rhine and is the chair of the Town's ordinance committee) and after a secret lunch meeting, the Town passed its version of the Ordinance on November 11, 2025, with the Town Chairman noting during the November 11 meeting that the Town needed to support the Village Board's action.

42.     Based on communications from Defendant Schott, it appears there was coordination of communications and discussions between multiple members of the Village Board of Trustees, potentially in violation of Wisconsin's Open Meetings Law, all in order to garner support in furtherance of the enactment of the Ordinance.

43. For example, in a January 14, 2025 text message (see ¶36 above), prior to enactment of the Ordinance or having it approved out of the Village's committee reviewing the same, Defendant Schott communicated to other municipal officials that Defendant "Lynn Shovan is on board with being proactive on this issue and would hopefully like to see something in place by the beginning of this boating season."

44. As another example, a former police chief for the Village sent a text message to Defendant Schott on April 10, 2025, noting he [former police chief] sent Defendant Mark Landgraf an email with a link to articles from the Elkhart Lake Improvement Association (ELIA), which supported a wake surfing ban (Schott is the president of ELIA), and "offered to talk to [Landgraf] on the subject." Schott gave a "thumbs up" reaction, approving that coordinated communication to another Village Trustee.

45. On or around April 2025, there was a group text communication from John Schott to a select few members of the public who wanted to completely ban wake surfing. Schott told those individuals what Defendant Wolf thought of wake surfing, while implicitly encouraging those members of the public to do Schott's bidding for him, saying, "more work is needed here but I have to stay at arms length!" At a subsequent Village meeting that spring, Wolf expressed his changed view and supported the Ordinance.

46. Prior to the Ordinance's passage, on May 7, 2025, there was a text message between Defendant Knowles and Defendant Schott regarding an article related to "concerns over wake-enhanced boating."

47. Text messages between Defendant Knowles and Landgraf occurred in October 25, 2025 discussing wake surfing regulation, with Landgraf providing his opinion on ordinance enactment regarding wake surfing.

48.     Upon information and belief, at minimum, Defendant Schott engaged in and or coordinated communications outside of a properly noticed meeting between Defendants Shovan, Landgraf, Knowles, and Wolf, which is a majority of the Village Trustees. At minimum, it appears there was a walking quorum or attempts to coordinate and authorize other individuals to speak and advocate for a wake surfing ban outside of properly noticed meetings outside of the requirements of Wisconsin's Open Meetings Law.

Wake Surfing

49.     Wake boats are almost exclusively the watercraft used for wake surfing. Wake surfing allows a person on a "surf" board to ride the "wave" created by the wake boat by using or not using a rope, and not going at a high rate of speed (unlike wakeboarding).

50.     Wake surfing occurs at a significantly slower speed compared to higher-speed and higher-impact watersports like wakeboarding, tubing, or water skiing.

51.     Wake surfing expands access to recreational opportunities through the use of wake boats. Wake surfing is a "low impact" watersport that is accessible for many ages and ability levels, including people with disabilities, physical limitations or infirmities, or those that can no longer incur the harder falls associated with water skiing or wakeboarding at high speeds. With the lower speeds and nature of wake surfing, a person that can no longer water ski or wakeboard due to age, health, disability, or physical limitation can participate in wake surfing.

52.     Wake surfing also allows wounded veterans, among others, to engage in a safe and therapeutic water sport, but the Ordinance also prohibits wounded veterans from wake surfing on Elkhart Lake, as well as preventing events from being held at Elkhart Lake which support our nation's veterans.

11

53. As one non-profit for veterans clearly stated, "As we consider hosting future events in Wisconsin, *we want to note that **we do not schedule events in towns, villages, or cities that have enacted 'enhanced wake' or 'wake surfing bans'** as those bans **prevent us from offering the full experience that is so essential to the healing journey of the veterans we serve.***" *See* Wake for Warriors letter, <u>Exhibit B</u>, attached and incorporated herein (emphasis added).

54. The Village's ban is an unjustified attack on wake surfing and against our nation's veterans seeking to access therapeutic watersports, preventing healing experiences like the one shown below:



55. With slower speeds and the nature of wake surfing, youth can also safely enjoy this recreational watersport without the risks of injury incurred in higher-speed and higher-impact watersports like water skiing and wakeboarding. The Ordinance bans *all children from wake surfing, which is a safe, low-impact water sport*.

12

56.     EWA has membership consisting of 14 individuals, the members of whom then recreate on Elkhart Lake with spouses, children, grandchildren, other relatives, and friends.

57.     All of EWA's members recreate on Elkhart Lake, with all of them using wake boats to engage in the watersport known as "wake surfing."

58.     The members' wake boats have the values as set forth in Exhibit C.

59.     When using their wake boats for wake surfing, none of EWA's members have been cited under existing state laws which prohibit unsafe boating, i.e., none of its members have been cited for creating a hazardous wake or wash on Elkhart Lake. Nor have any of its members been cited under state law or local ordinances for operating a wake boat too close to a shoreline, other boats, or other structures on Elkhart Lake. *See* Wis. Stat. § 30.68(4)(a); Wis. Stat. § 30.66(3)(a), (ar), and (b); Elkhart Ord. § 7.02; Elkhart Ord. §7.03(1).

60.     Even with the presence of the Ordinance and the Ordinance directing that law enforcement "shall" enforce the Ordinance, all of EWA's members intend to continue to use their boats for wake surfing on Elkhart Lake in 2026 and beyond.

61.     EWA's members include people of all ages and abilities. Some members skew more elderly, while others are younger. All members have families with children, grandchildren, mothers, fathers, or other relatives that recreate on Elkhart Lake through wake surfing. Some have disabilities, and while high-impact watersports like water skiing and tubing are improper for such individuals, wake surfing is the only safe watersport that remains.

62.     As set forth in more detail below, certain members of EWA or their family members are physically limited from engaging in higher-impact watersports like water skiing, wakeboarding, or tubing, which have higher speeds, more strenuous pulling/tension from a rope,

13

and harder falls associated with those watersports. Wake surfing is their safe, and oftentimes only, alternative for engaging in a watersport on Elkhart Lake.

63.     One member of EWA, Gregory P McComis, owns real property on Elkhart Lake with an address of W6652 E Shoreland Road, Elkhart Lake, WI 53020, with such property abutting Elkhart Lake.

64.     McComis also owns one of the boats and equipment listed in Exhibit C. McComis' wake boat (the "McComis Boat") is used exclusively on Elkhart Lake during non-winter months (i.e., the open water season) and is not transported to other lakes during non-winter months.

65.     McComis wake surfs using the McComis Boat and takes other individuals out on Elkhart Lake to engage in wake surfing. When doing so, McComis exclusively wake surfs on Elkhart Lake and does not use his wake surfing boat on other lakes. Wake surfing is a watersport that McComis can, and has, safely engaged in on Elkhart Lake. McComis is in his mid-60s and has had multiple procedures and treatments for back pain, which now effectively precludes him from participating in other high impact water sports exempted by the Ordinance. He has recreated on Elkhart Lake for six decades and purchased the McComis Boat so he could enjoy the waters he grew up on in safe manner with little risk. As all other members of EWA intend to, McComis fully intends to continue engaging in wake surfing, despite the Ordinance and the threat of law enforcement to enforce the Ordinance because it is the water sport he can safely engage in based on his health issues.

66.     Another member of EWA, who will be individually-identified as "Member A," owns real property on Elkhart Lake, with such property abutting Elkhart Lake.

67. Member A also owns one of the boats and equipment listed in Exhibit C. Member A's boat is used exclusively on Elkhart Lake during non-winter months (i.e., the open water season) and is not transported to other lakes during non-winter months.

68. Member A wake surfs using that Member's boat and takes other individuals out on Elkhart Lake to engage in wake surfing. Wake surfing is a watersport that Member A can, and does, safely engage in on Elkhart Lake. As all other members of EWA intend to, Member A fully intends to continue engaging in wake surfing, despite the Ordinance and the threat of law enforcement to enforce the Ordinance because it is the water sport he can safely engage in.

69. Member A also is the parent to a minor child. That minor child has a spinal condition, but wake surfing, as a low-impact, low-speed watersport, is permissible and safe for the child. Member A's child has wake surfed for years on Elkhart Lake. ***The Ordinance now purports or attempts to ban that child from wake surfing on Elkhart Lake and does not accommodate the minor child's spinal condition***.

70. Member A also has another child who has suffered non-wake surfing-related concussions. Wake surfing is a low-speed, low-impact watersport that the second child can enjoy with less concussion risk than higher-speed, higher-impact watersports like wakeboarding, water skiing, or tubing, watersports which the Ordinance allows. ***If the second child wants to engage in watersports on Elkhart Lake, the Ordinance does not accommodate the second child's concussions and now purports or attempts to prohibit that second child from wake surfing on Elkhart Lake, and to instead engage in high-speed, high-impact watersports which may exacerbate adverse impacts from prior concussions.***

71. Member A fully intends to continue taking his children on Elkhart Lake to engage in wake surfing, despite the Ordinance and the threat of law enforcement to enforce the Ordinance

15

because it is the water sport the children can safely engage in based on their respective health issues.

72. Another member of EWA, who will be individually-identified as "Member B," owns real property on Elkhart Lake, with such property abutting Elkhart Lake.

73. Member B also owns one of the boats and equipment listed in <u>Exhibit C</u>. Member B's boat is used exclusively on Elkhart Lake during non-winter months (i.e., the open water season) and is not transported to other lakes during non-winter months.

74. Member B wake surfs using that Member's boat and takes other individuals out on Elkhart Lake to engage in wake surfing. Member B has back and knee issues which limit Member B from safely engaging in high-impact, high-speed watersports such as water skiing, wakeboarding, and tubing. Wake surfing is a watersport that Member B can, and does, safely engage in on Elkhart Lake. As all other members of EWA intend to, Member B fully intends to continue engaging in wake surfing, despite the Ordinance and the threat of law enforcement to enforce the Ordinance because it is the water sport he can safely engage in based on his health issues.

75. One member of EWA, who will be individually-identified as "Member C," owns real property on Elkhart Lake, with such property abutting Elkhart Lake.

76. Member C also owns one of the boats and equipment listed in <u>Exhibit C</u>. Member C's wake boat is used exclusively on Elkhart Lake during non-winter months (i.e., the open water season) and is not transported to other lakes during non-winter months.

77. Member C has wake surfed using the Member C's boat and takes other individuals out on Elkhart Lake to engage in wake surfing. When doing so, Member C exclusively wake surfs on Elkhart Lake and does not use his wake surfing boat on other lakes. Wake surfing is a watersport

16

that Member C can, and has, safely engaged in on Elkhart Lake. Member C has had a series of health issues that prevent him from personally engaging in high-speed, high-impact watersports such as water skiing, wakeboarding, or tubing, activities which the Ordinance allows. As all other members of EWA intend to, Member C fully intends to continue engaging in wake surfing, despite the Ordinance and the threat of law enforcement to enforce the Ordinance because it is the water sport he can safely engage in based on his health issues.

78. The Village of Elkhart Lake's ban on wake surfing prevents such physically limited or disabled individuals, such as the individual members or their children above, from engaging in a safe and therapeutic water sport and does not reasonably accommodate them.

<u>Prior to Ordinance's Passage, Defendants Received Lake-Specific Study That Justified Compromise, not a Complete Ban</u>

79. In contrast to the lack of scientific or other documented support on Elkhart Lake to justify a complete ban on a legal watersport (discussed infra), prior to passage of the Ordinance, the Village received an Elkhart Lake-specific study ("Elkhart Wake Study") (*available at* https://www.youtube.com/watch?v=kDZOFF7l88g) demonstrating the safety and lack of impacts of wake surfing compared to other water sports and boat uses which are not subject to the same purported bans as wake boats and wake surfing are under the Ordinance.

80. The Elkhart Wake Study was emailed to the Village Trustees on October 19, 2025.

81. The Elkhart Wake Study showed that with *no ballast* (allowed by the Ordinance)*,* someone "tubing" at 19 miles per hour (also allowed under the Ordinance), 200 feet from shore (the limit under existing ordinances) creates a *larger* wake than a wake surfer (with full ballast) 200 feet from shore.

82. The Elkhart Wake Study showed the amplitude of a tuber's wake at 200 feet was *double* the amplitude of a wake surfer (with full ballast) 300 feet from shore.

17

83. Viewing the Elkhart Wake Study revealed the wake of a surfer 300 feet from shore traveling at 11 miles per hour (the distance proposed in the Compromise Ordinance, discussed *infra*) is almost indistinguishable from the ripple of the wind over the water when the wake reaches shore.

84. The Elkhart Wake study revealed the wake heights measured near shore were as follows:

    i. Tubing 200 feet from shore at 19 miles per hour: 8.5 inches as measured on a yard stick (4.5 inches of amplitude).

    ii. Surfing at 200 feet from shore at 11 miles per hour: 7 inches on a yard stick (3 inches of amplitude)

    iii. Surfing at 300 feet from shore at 11 miles per hour: 5.5 inches on a yard stick (1.5 inches of amplitude)

85. The Elkhart Wake Study corroborated and further affirmed the safety and rationality of the Compromise Ordinance (discussed *infra*) as proposed to the Village Board. Nonetheless, despite that evidence favoring wake surfing on Elkhart Lake specifically, the Board enacted the Ordinance to completely prohibit a watersport which has been legal for decades, acting in an arbitrary and capricious manner, without sufficient (or any) evidence specific to Elkhart Lake.

86. Prior to passage of the Ordinance, in a conversation between a member of the public and Defendant Schott on October 28, 2025, Schott made several remarks regarding the Elkhart Wake Study:

    i. Schott tried to first discredit the Elkhart Wake Study, saying he had seen it, but then said, "I'll give you one, uh, observation about your video, that all three of those scenarios showed somebody towed with a rope. When you're wake surfing, you don't use a rope." Setting aside that one of the examples

was a tuber (who needs to use a rope to get towed in that watersport), there is no known evidence that using or not using a rope has any influence on wave height, and many people wake surf with a rope if they need help with balance. Nonetheless, and somewhat incredible in the level of its irrationality, the presence of a rope was used as a justification by the Trustee to discredit the study as if using a rope to wake surf somehow magically made the waves in the Study smaller.

ii. Despite the plain videotaped evidence documenting the lack of a wake's size when surfing 300 feet from shore on Elkhart Lake (or smaller size of a wave at 200 feet when compared to a tuber), Schott stated, "What you've shown isn't helpful," apparently because it did not fit his predetermined narrative or decision to enact the Ordinance, which in his words from March earlier this year, was "***an ordinance eliminating wake boats/wake surfing from Elkhart.***"

iii. Schott then claimed the video didn't replicate what happens on Elkhart Lake, despite the plain fact that the Elkhart Wake Study replicated wake surfing with full ballast at 11 miles per hour on Elkhart Lake, with the boat operating in the required counter-clockwise fashion, exactly as it occurs on the lake. Schott claiming this is not what happens on Elkhart Lake is odd, as Schott admitted during that call that he has never wake surfed or been on a wake boat. (He also did not take up a riparian owner's offer to go on a wake boat to observe wake surfing in the Summer 2025 or the offer to see the Study replicated live).

iv. If Schott truly had doubts about the validity of the Elkhart Wake Study and/or its integrity, on October 20, 2025, all Trustees, including Schott were offered the following opportunity to observe a live replication of the Study, with the Study's creator offering the following to the Trustees: "We *are happy to replicate these findings live on the water* and even add a pontoon boat at 20 mph, 200 feet from shore pulling a tuber, which we believe will produce an equivalent or larger wave than a wake surf boat, full ballast 200 feet from shore." No Trustees sought to see the live results for themselves.

87. Nonetheless, despite that evidence favoring wake surfing on Elkhart Lake specifically, especially with the Compromise Ordinance (referenced *infra*) that was consistent with the Elkhart Wake Study and the Second SAFS (which Trustee Schott called the "gold standard"), the Board enacted the Ordinance in an attempt to completely prohibit a watersport which has been legal for decades, acting in an arbitrary and capricious manner, without sufficient evidence specific to Elkhart Lake.

<u>Decades of Wake Surfing and Elkhart Lake's Water Quality is Still "Excellent"</u>

88. Further, the Defendants may claim the wake surfing ban is justified because of water quality issues on Elkhart Lake, allegedly caused by wake boats and wake surfing. There is no known evidentiary support for that claim on Elkhart Lake.

89. Wake boat use and wake surfing has occurred on Elkhart Lake for decades. Rather than being the cause of lake degradation issues on Elkhart Lake, water quality studies demonstrate that Elkhart Lake remains a lake that the Wisconsin Department of Natural Resources classifies as having a TSI average score of 42 over the last five (5) years, which classifies the water quality as "excellent," even after the decades-long use of wake boats and wake surfing. (It is also classified

20

as "excellent" for recreation.) (Lake conditions *available at* *https://apps.dnr.wi.gov/lakes/lakepages/LakeDetail.aspx?wbic=59300&page=waterquality* and https://apps.dnr.wi.gov/water/waterDetail.aspx?WBIC=59300). Those conclusions about "excellent" water quality are notably absent from the Village's so-called "condition report," drafted by a special interest advocacy group that would only assist if a wake surfing ban was enacted, not a depth and distance restriction.

90. Apparently ignoring the conditions of Elkhart Lake itself, the so-called "condition report" also cites "high levels of phosphorus" on Elkhart Lake and rather incredibly states that phosphorus disturbance on the lake bed could be an issue, in a lake that is 119 feet deep and has a mean depth of 46 feet – where wake surfing occurs in deep areas greater than 20 feet.

91. Contrary to the speculative and uncredible conclusions not specifically tied to Elkhart Lake itself, on August 1, 2025, the Elkhart Lake Improvement Association ("ELIA"), received a report it had commissioned from Stantec that related to Elkhart Lake's water quality ("Stantec Report"). (The President of ELIA is also a Village Trustee who voted in favor of the Ordinance and who coordinated support of and passage of the Ordinance between his two conflicting roles as ELIA President and as a Village Trustee, and who also solicited an outside special interest advocacy group to have draft the "condition report" for the Village.)

92. The Stantec Report concluded Elkhart Lake's water quality "is generally very good" but noted some ecological aging due to "phosphorus loading."

93. The Stantec Report concluded "***no action is needed*** at this time to mitigate sediment phosphorus release" from "***internal phosphorus loading from Elkhart Lake***." That is, if wake boats (or any boats or activities) were the basis for phosphorus issues within the lake, the Stantec Report should have both identified and listed those as issues, but it did not.

21

94. Instead, the Stantec Report said what should be "***prioritized***" to address water quality issues was to "***reduce nutrient loading to the lake***" from off-site sources, i.e., address off-site runoff sources, not prohibiting one particular type of boat or on-lake activity, especially one that primarily occurs in deep areas of the lake where the bottom cannot be disturbed under the results of *any* study, even the most virulent anti-wake surfing studies. Again, the "condition report" ignored or did not get supplemented with facts which did not support a complete ban on wake surfing.

Defendants Rejected Educational Opportunities

95. Prior to the passage of the Ordinance, multiple persons opposing a complete wake surfing ban on Elkhart Lake offered additional educational opportunities to help Trustees learn more about wake surfing, including an informational presentation from an engineer. The Village rejected that additional educational opportunity that would have cast doubt on the merits of a complete wake surfing ban.

96. Prior to the passage of the Ordinance, one riparian owner on Elkhart Lake offered to take each Village Trustee out on his wake boat individually to observe wake surfing and see the lack of impacts on Elkhart Lake. Only one Trustee out of seven took up that individual on his offer and all other Trustees either ignored or did not take advantage of the opportunity to see the actual lack of impacts from wake surfing on Elkhart Lake.

Reasonable Alternatives to Restrict (Rather than Ban/Prohibit) Proposed, But Rejected

97. Prior to the passage of the Ordinance, multiple proposals to reasonably restrict, instead of completely prohibit wake surfing were proposed to the Village. Instead of enacting reasonable restrictions, the Village enacted its complete prohibitions.

22

98. Prior to passage of the Ordinance, the Village Board did not assemble a committee of three riparian owners in favor of the Ordinance and three riparian owners opposed to the Ordinance to engage in a collaborative approach that could result in practical, inclusive solutions and not a divisive, complete ban on wake surfing. Other Wisconsin municipalities have adopted this type of committee to approach the topic of wake enhance to create compromises that accommodate all users.

99. The Village first contemplated allowing wake surfing with a 700-foot setback from shore, but the Village rejected that option, claiming it was too difficult to enforce, and instead abused its so-called local control to create a complete ban on the 119-foot deep Elkhart Lake.

100. Contrary to its justification to reject a setback, existing ordinances from the Village of Elkhart Lake demonstrate that setbacks are a viable means to keep boat traffic away from shore. The Village implements a buoy system around the entirety of Elkhart Lake which requires of all boats a speed of "slow no wake" on the shoreside of a designated buoy system – generally 200 feet from shore. That is, there is a slow no wake requirement 200 feet from the shore.

101. Also contrary to its justification that a setback ordinance is too difficult to enforce, the Village's Police Chief wrote in an email to a Village Trustee on April 29, 2025, that "over the last couple of years with [another law enforcement officer] working we have really *increased our enforcement of distance related ordinances/laws on the lake*."

102. The approximately 55 citations issued for violations of that setback ordinance confirms that enforcement of setback ordinances is clearly feasible and enforceable. If buoys were the issue for the Village, that is a very manageable issue, as other municipalities in Wisconsin enforce wake setback ordinances using range/distance finders to confirm whether a boat is operating in a restricted area. The bottom line is this: Existing setback ordinances on Elkhart Lake

23

work for all boats, including wake boats, and the lack of any citations issued to EWA's members for operating wake boats when wake surfing from 2020 to the present is further evidence that wake boats are not the issue on Elkhart Lake.

103.     In May 2025, the Village received a proposal from legal counsel for riparian owners (and now members of EWA) to grandfather or exempt riparian owners from the complete prohibitions in the Ordinance. The riparian owner exemption would have allowed riparian owners who keep their wake boats on Elkhart Lake to continue wake surfing and be exempt from the prohibitions while still operating with other wake limits pertaining to hours and setbacks. In essence this would create a "home lake" rule where riparian owners' boats do not move from lake to lake and would remain on Elkhart Lake if they wanted to wake surf. Upon information and belief, the Village's attorney advised the exemption was legal, but the Village rejected that compromise for a riparian owner exemption.

104.     Opting for a complete ban, instead of a narrower, reasonable exemption for riparian owners or a "home lake" rule for non-riparian owners defies rationality. *Assuming arguendo* that concerns regarding the transfer of aquatic invasive species ("AIS") with wake boats is legitimate and not made in bad faith, the riparian owner/home-rule exemption would address concerns regarding the potential transfer of AIS and would help ensure wake boats that use Elkhart Lake would remain on Elkhart Lake, while also limiting "off-lake" wake boats from coming onto Elkhart Lake if they had been wake surfing elsewhere. Conversely, without a riparian owner/home lake exemption to a complete ban, those wake boats on Elkhart Lake, in order to be used for their intended purpose may be forced to travel to Lake Michigan or Lake Winnebago, and return to Elkhart Lake, potentially exacerbating the issue the Village may claim it is trying to prevent through a complete wake surfing ban.

24

105. Undeterred by the Village rejecting compromises or exemptions to reasonably accommodate wake surfing, wake surfers on Elkhart Lake proposed another compromise. In response to a second "St. Anthony Falls" study from Minnesota ("Second SAFS"), and even though Plaintiff may disagree with many if not all of its findings, riparian owners (and now members of EWA) proposed an alternative ordinance to the Village which was consistent with the Second SAFS pertaining to operation of wake boats and wake surfing based on the depth of water and distance from shore for wake surfing.

106. Prior to the issuance of the Second SAFS, one Village Trustee, who sought to ban wake surfing (and who voted in favor of the Ordinance), said in an email that he was "***eager*** to get the results of the [Second SAFS] study *which will hopefully be additional support to the restrictions we are seeking **on the use of wake boats***." (Again, more intent to target and exclude a boat type for Elkhart Lake.)

107. In what appears to be an apparent attempt to influence the Second SAFS before its release, that same Village Trustee ***proactively emailed one of the authors of the Second SAFS before the study was complete*** and said, "As you may be aware, the WI legislature is looking at implementing some very bad legislation concerning wake boats ***so we will eagerly await your proper [sic] wash report when it becomes available.***" Why would a Trustee email the author of the study before it was issued? The email from that Trustee speaks for itself, as he was, "***eager*** to get the results of the [Second SAFS] study *which will hopefully be additional support to the restrictions we are seeking **on the use of wake boats.***"

108. That Trustee also emailed the director of the Sheboygan County planning and conservation department, stating, "The U of Minn St Anthony Falls seems to be the *gold standard*

25

on wake propagation impact and they will have a second report this spring *which includes water depth considerations.* I am eager to see this." (emphasis added).

109. After the release of the Second SAFS in July 2025, wake surfing proponents on Elkhart Lake proposed a compromise ordinance ("Compromise Ordinance") to the Village during a public hearing on September 29, 2025 (and emailed the same to Village Trustees and Town Supervisors on September 26, 2025). According to the individual sending the Compromise Ordinance to the Trustees, the Compromise Ordinance "accomplishes mutual goals of protecting the lake and its users while maintaining riparian and non-riparian rights."

110. The Compromise Ordinance contained restrictions to confine wake surfing in the big bay of Elkhart Lake, and away from shallow areas, consistent with that Second SAFS. Generally speaking, the Compromise Ordinance proposed to allow wake surfing, but with the following restrictions:

    i. A designated zone for wake surfing, which would generally be at least 300 feet from shore, i.e., no wake surfing within 100 feet of the existing no-wake zone on Elkhart Lake which is generally 200 feet from shore; and

    ii. Wake surfing would occur in a minimum of 20 feet of water (as recommended by the Second SAFS to "minimize impacts to the lake bottom"). In fact, the areas which allowed wake surfing in the Compromise Ordinance were significantly *deeper than 20 feet* (see map, referenced *infra*)

111. The Compromise Ordinance provided substantiation and justification for the reasonable limits, based on multiple studies, including the Second SAFS, and contained a map showing which areas of Elkhart Lake would be allowed for wake surfing:

26

**Existing Buoy System:**

The yellow lines signify the existing buoy system. The lines are the segments between each buoy as provided in Chapter 7 of the Elkhart Lake Boating Code. The red line is a 100 foot buffer from the existing no-wake zone.

112. The Elkhart Wake Study further solidified and supported the Compromise Ordinance's proposed 300-foot setback on Elkhart Lake. With wake boat operating at 11 miles per hour with full ballast and 300 feet from shore, the wake at the shore was de minimus and barely discernible from ordinary wave action on Elkhart Lake:

27



(Screenshot of wave height's crest in Elkhart Wake Study at 300 feet with wake boat with full ballast, full video *available at* https://www.youtube.com/watch?v=kDZOFF7l88g)

113. Despite the Elkhart Wake Study and the Village Trustee's admission that he "eagerly awaited" the results of the Second SAFS which came from the authors of the so-called "gold standard" of studies, when that Trustee received those results and a Compromise Ordinance with reasonable restrictions that was consistent with that Second SAFS (and supported by the Elkhart Wake Study), the Trustee (as well as others) still voted to completely ban wake surfing by voting in favor of the Ordinance and rejected the Compromise Ordinance.

## COUNT I

**(Declaratory Judgment under Wis. Stat. § 806.04 – Ordinance is *Ultra Vires,* as Ordinance Exceeded Statutory Authority when Village Failed to Make Required Findings and Support for Findings on Elkhart Lake (Wis. Stat. § 30.77(3)(cm)1.-3.)**

114. Plaintiff realleges all prior allegations.

115. The Village has limited authority to enact ordinances restricting use of the waters of the state, such as Elkhart Lake.

28

116. Unless the Village enacts an ordinance pursuant to its authority in Wis. Stat. § 30.77(3), an ordinance, "that *in any manner* excludes any boat from the free use of the waters of this state *or that pertains to the use, operation or equipment of boats* or which governs any activity regulated by ss. 30.50 to 30.71" is prohibited. Wis. Stat. § 30.77(1)(b) (emphasis added).

117. Prior to the Village enacting an Ordinance under Wis. Stat. § 30.77(3) "for a given body of water," such as Elkhart Lake, the Village *"shall* take into account factors that include *all of the following*: 1. The type, size, shape and depth of the body of water and any features of special environmental significance that the body of water has. 2. The amount, type and speed of boating traffic on the body of water and boating safety and congestion. 3. The degree to which the boating traffic on the body of water affects other recreational uses and the public's health, safety and welfare, including the public's interest in preserving the state's natural resources." Wis. Stat. § 30.77(3)(cm)1.-3 (emphasis added).

118. The Village failed to take into account all of those mandatory factors for Elkhart Lake.

119. No specific findings of fact were made by the Village in its Ordinance relating to Elkhart Lake.

120. There was no discussion when the Ordinance passed that created findings that justified the prohibition.

121. None of the "Whereas" clauses make the findings required as it pertains to any specific lake, much less Elkhart Lake specifically.

122. Any so-called "Condition Report" that the Village may attempt to rely on after-the-fact is not referenced or referred to in the Ordinance as being relied on.

123.     Any so-called Condition Report does not discuss the "amount, type and speed of boating traffic on [Elkhart Lake] and boating safety and congestion" and any so-called Condition Report does not review the "degree to which the boating traffic on [Elkhart Lake] affects other recreational uses and the public's health, safety and welfare, including the public's interest in preserving the state's natural resources."

124.     There are no known studies with scientific evidence conducted by the Village specific to Elkhart Lake which justify the prohibition of wake surfing.

125.     Upon information and belief, the Village failed to assess the specific amount, type, and speed of boating traffic on Elkhart Lake and boating safety and congestion when it enacted its Ordinance. *Assuming arguendo,* if the Village possessed and used any traffic audits or studies, the results contained therein did not justify a complete prohibition on wake surfing.

126.     Upon information and belief, the Village of Elkhart Lake or anyone else seeking to ban wake surfing have not conducted environmental studies specific to Elkhart Lake which justified their Ordinance's extreme action – a complete ban on a legal watersport.

127.     One Village resident who was helping to lead the proverbial charge to ban wake surfing boats and who emailed multiple Village Trustees regarding a wake surfing ban admitted that the facts and science were not there to justify a ban. On April 3, 2025, the resident stated during public comment at the Village's Protection of Person & Property Committee, that, "***I know you want science***, there is, right now, plans to get that science, ***but it's not here yet.***" That village resident, based on text messages between her and Defendant Schott, coordinated communications ahead of that April 3 public comment period.

128.     Prior to the passage of the Ordinance, materials presented to the Village Board supporting a wake surfing ban contained misrepresentations and inaccuracies. These materials

30

were prepared with a bias in interpreting the results and relied on studies with well documented deficiencies. Additionally, the materials do not provide the complete context of work where data suggests a conclusion contrary to the non-wake surfing position.

129. Further, at least one of the studies that the Board may have relied on (which was not based on Elkhart Lake) was created after monies were allocated or paid from a lake district to that study's author, and after that lake district's leadership publicly lobbied for and expressed support for a complete ban on a different lake than Elkhart. The district got the results it paid for, for that lake specifically, but not Elkhart Lake.

130. Prior to passage of the Ordinance, the Village Board did not engage experts to perform scientific, fact and data-based studies over time to determine the impact of wake surfing, if any, on Elkhart Lake.

131. Upon information and belief, prior to passage of the Ordinance, the Village did not consider specific boating traffic issues for Elkhart Lake and failed to cite the amount of boating traffic in their discussions during the November 3 Meeting.

132. Based on drone photos and aerial video taken by Sheboygan County in 2025, it is apparent why the Village would not factor traffic into its discussion: Because doing so would negate the reasonableness of a complete prohibition on wake surfing and would further exacerbate the arbitrariness of the Ordinance's prohibition.

133. In 2025, upon information and belief, Sheboygan County used a drone to target potentially the "busiest" days of the year on Elkhart Lake, in an apparent attempt to help the Village justify a complete ban on wake surfing. The results were not only underwhelming, but support the opposite conclusion that a ban was required or reasonable.

134. On March 19, 2025, prior to Sheboygan County flying its drone to document traffic on Elkhart Lake, Defendant Schott emailed Sheboygan County Planning & Conservation Director Aaron Brault. The subject line of the email was "Drone video" and asked Brault if there was "Any prayer of seeing these this spring? Would be a *big help in our discussions on wake boats*." (emphasis added).

135. The drone footage is a "big help" to show there is minimal boat traffic and plainly, that there is room for all boats to operate safely together, even on the "busiest" days of the year. The photos from Sheboygan County's drone footage speak for themselves that there is plenty of room on Elkhart Lake to accommodate all lake users, including wake boats.

136. On Memorial Day Weekend, Saturday, May 24 at 12:33 p.m., the following picture shows only a single boat in the "big bay" where the Compromise Ordinance sought to designate/limit wake surfing:



137. On Memorial Day Weekend, on Sunday, May 25, time unknown, the following picture shows maybe one boat operating outside the 200-foot setback in the "big bay," where the Compromise Ordinance sought to designate/limit wake surfing. The deepest portions of the lake are unoccupied by other boats:



138.     On Memorial Day Weekend, Monday, May 26, 2025 at approximately noon, the following picture shows no boats operating in the big bay portions designated for wake surfing in the Compromise Ordinance:



139.    A week after Memorial Day Weekend, Saturday, May 31, 2025 at approximately 4:05 p.m., the following picture shows wide open spaces in the middle of the area designated by the Compromise Ordinance for wake surfing, with one boat present:



140.    On July 4, 2025 at 12:05 p.m., the following pictures shows a minimal assortment of recreational watercraft are on Elkhart Lake, such as tubers, but significant space and distance in the big bay exists between those watercraft, and no motorboats are near the single sailboat on the northeast side of the lake. Large empty space in the big bay exists, as the designated area proposed in the Compromise Ordinance for wake surfing:



36

141. On July 4, 2025 at 12:05 p.m., the following picture shows a minimal assortment of recreational watercraft, but significant space and distance in the big bay between those watercraft, and again, no motorboats near the single sailboat on the NE side of the lake. Large empty space in the big bay exists, as the designated area proposed in the Compromise Ordinance for wake surfing:



142. There is no reasonable, non-arbitrary reason to justify a complete ban on wake surfing, even on the "busiest" days of the year, much less a complete wake surfing ban on every day of the open water season.

143. There exists justiciable controversies between the parties.

144. The interests of the Plaintiff and Defendants are adverse.

145. Plaintiff has a legally protectable interest that is the subject of this controversy, and thus, in achieving a declaration of their rights and interests.

146. The issues involved in said controversy are ripe for judicial determination.

147. Further, if the issues presented are resolved by the Court, such resolution will end this controversy.

## COUNT II
### (Declaratory Judgment under Wis. Stat. § 806.04 – Ordinance is *Ultra Vires* as Wis. Stat. § 30.77(3)(cr) Does Not Authorize Complete Prohibition)

148. Plaintiff realleges all prior allegations.

149. The Village has limited authority to enact Ordinances under Wis. Stat. § 30.77.

150. Sections 1 and 2 of the Ordinance "prohibit" certain activities and the Village exceeds its statutory authority by creating outright prohibitions, i.e., bans., instead of what the statute limits the Village to – "restrictions."

151. "Restrictions," as set forth in Wis. Stat. § 30.77 are different than "prohibitions," i.e., bans.

152. Defendant Schott admitted the difference and distinction between a ban and a restriction. In response to a text message from a member of the public before February 25, 2025, which asked, "May I ask is your opinion to *ban wakeboats* or *restrict* where they can be used on the lake?" (emphasis added). Schott replied, "*if reasonable – restrict*. My guess is sentiment is general is to *ban*." (emphasis added). Schott's response also further shows the intent of the Ordinance to overbroadly and completely ban a particular type of boat from Elkhart Lake, in violation of the Public Trust Doctrine and other legal requirements under Wisconsin law.

153. Shortly before that, on February 13, 2025, Schott again admitted and noted a clear distinction between a prohibition and a restriction. Schott provided information to a Village

38

committee to outline the process for passing an Ordinance, which stated an outside group would help draft a so-called condition report, but "[o]nly if we are *prohibiting* wake surfing." (emphasis added). Schott then continued in his communication that, "If we want to establish a 'depth and distance' *restriction,* [the outside organization] will not." (emphasis added).

154. Prior to passage of the Ordinance, the Village has shown and has a long history of accommodating all types of boats on Elkhart Lake through restrictions, not complete prohibitions. Non-motorized motorboats have their own day each week to have Elkhart Lake all to themselves. Elkhart Lake has a strict "no wake" day through a Village ordinance, where motorboats are not allowed to operate on Sundays, on the entirety of Elkhart Lake. That is, for a temporary and limited period, this *restricts* all motorboats (including wake boats) from operating on Sundays, but does not outright prohibit them from operating during the other days of the week on Elkhart Lake.

155. To further accommodate all lake users, such as canoeists, kayakers, or fishermen, for the other six days of the week, the Village ordinances *restrict* the hours a motorboat can make a wake or tow a person on a water ski, aquaplane or similar device from 7:30 p.m. to 10 a.m. This already limits wake surfers from operating during those "quiet" hours.

156. Instead of working within familiar, existing regulatory structures to accommodate wake surfing by restricting wake surfing to certain hours, days of the week, distances from shore or structures, or depths, the Ordinance completely prohibits wake surfing, exceeding the Village's authority under state law.

157. Existing *restrictions* (as opposed to the Ordinance's complete *prohibition*) on wake surfing through normal "no wake"/no motorboat operation Sundays and limits on surfing during evening and morning hours have proven effective to ensure wake surfing on Elkhart Lake co-exists with other users and that safety is not an issue.

158. There exists justiciable controversies between the parties.

159. The interests of the Plaintiff and Defendants are adverse.

160. Plaintiff has a legally protectable interest that is the subject of this controversy, and thus, in achieving a declaration of their rights and interests.

161. The issues involved in said controversy are ripe for judicial determination.

162. Further, if the issues presented are resolved by the Court, such resolution will end this controversy.

<u>**COUNT III**</u>
**(Declaratory Judgment under 28 U.S.C. §§ 2201-2202– Ordinance is Unconstitutionally Vague (Void for Vagueness) and Overbroad and Violates Plaintiffs' Constitutional Rights to Procedural Due Process under the Fourteenth (14th) Amendment of the U.S. Constitution– 42 U.S.C. § 1983)**

163. Plaintiff realleges all prior allegations.

164. A municipality, such as the Village, is subject to liability under § 1983 if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Soc. Serv. of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

165. The Ordinance is void due to vagueness and violates Plaintiffs' rights to procedural due process under the 14th Amendment of the United States Constitution.

166. The Ordinance contains little to no definitions for any of its terms. Multiple terms in the Ordinance are vague (and therefore void for vagueness), overbroad, ambiguous, lack fair notice to Plaintiff and its members, and are susceptible to and encourage arbitrary and discriminatory enforcement against Plaintiff's members due to the lack of discernable criteria, which violates the Due Process Clause.

40

167. The void-for-vagueness doctrine "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes [and] guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018).

168. A supervisor for the Town of Rhine, which has also passed the identical Ordinance language, admitted the potential subjectivity and lack of standards regarding enforcement of language in the Town's ordinance that is nearly identical to the Ordinance. Regarding enforcement, that Town Supervisor emailed a Village Trustee and said, "it would be up to law enforcement to judge whether or not the operator was deploying the wake equipment. . . law enforcement (in this case Village of Elkhart Lake police, acting as Town of Rhine Constables) *were lukewarm about when to stop someone*. . ." (emphasis added).

169. There is also no guidance issued to law enforcement in the Ordinance itself.

170. Upon information and belief, there has been no guidance issued to law enforcement from the Village after the Ordinance's enactment for how to interpret and enforce the Ordinance.

171. Upon information and belief, there is also no training provided to law enforcement for them to interpret and enforce the Ordinance.

172. The Village has law enforcement and a boat patrol unit to enforce the Ordinance, as it has enforced and issued citations for other Village ordinances on Elkhart Lake.

173. The Village will attempt to enforce the Ordinance against Plaintiffs who seek to engage in wake surfing.

174. The Ordinance contains no definition for "bow high manner" or "artificially bow high manner."

175. Those terms – "bow high" and "artificially bow high" – also appear to be different and conflict with each other, creating additional vagueness.

176. While operating their respective wake boats during wake surfing activities, all of EWA's members are able to safely see over the bow of their boat, can view the water and what is in front of their respective boats, and continue to operate their respective boats in a safe manner.

177. All of EWA's members understand they are not operating in a "bow high" or "artificially bow high" manner since they can safely see over and operate their wake boats while wake surfing. However, in the context of this Ordinance and its undefined terms, EWA's members are unaware whether operating their wake boats when wake surfing will violate those vague and ambiguous terms.

178. There are no guidelines, measurements, or other calculable basis for enforcement in the Ordinance to determine whether a boat is operated in a "bow high manner" or "artificially bow high manner" giving virtually complete discretion to law enforcement to justify a stop of the Plaintiffs' wake boats in an attempt to further search or enforce the Ordinance.

179. For example, wake boats, when engaged in wake surfing, operate in a manner that is not apparently "bow high" or "artificially bow high" as the operator of the boat can see over the bow of the boat, as shown below. Under the Ordinance, is this allowed or not? Who knows, until it is enforced, without any guidelines, measurements or other calculable, non-arbitrary basis for enforcement:





Photo credit to Paul A. Smith of the *Milwaukee Journal Sentinel*, for image showing wake boat that does not appear to be operating in a "bow high manner" while wake surfing.

43

180.    In contrast, other exempt activities allowed under the Ordinance, such as water skiing, wakeboarding, or tubing, apparently have no limits on operating in a "bow high manner," so long as ballast tanks, ballast bags, or fins aren't used. For example, the Ordinance appears to allow the following activities and it is unclear if the boat is operating in a "bow high" or "artificially bow high" manner, but because the individual is being towed by a rope, the Ordinance might allow this or might not.



44

181. The below fishing boat is operating in a manner that has a higher bow than a wake boat (compare images in ¶179), the driver can't see over the bow, and depending on the enforcement officer, could be construed to be operating in an "artificially bow high" manner contrary to the Ordinance. The Ordinance may prohibit fishing boat operation if the use of the outboard motor is "artificial," the boat as pictured here is "bow high" and if the motor has increased the boat's wake, but it is unclear if this would be prohibited by the Ordinance until it's enforced, because the terms of the Ordinance are vague and ambiguous.



182. If boats similar to the above fishing boat are not targeted for operating in a "bow-high manner" or an "artificially bow high manner," but the Ordinance targets wake boat operations as shown in Paragraph 179, above, then the Ordinance is unlawfully targeting and attempting to ban use of a wake boat. Across-the-board regulation by boat size, type of boat, or horsepower has been considered and is an unwarranted prohibition on public rights.

183. The below pontoon boat is operating in a manner that has a higher bow than a wake boat (compare images in ¶ 179), and depending on the enforcement officer, could be construed to be operating in an "artificially bow high" manner contrary to the Ordinance. The Ordinance may prohibit pontoon boat operation if the use of the outboard motor is "artificial," the boat as pictured

45

here is "bow high" and if the motor has increased the boat's wake, but it is unclear if this would be prohibited by the Ordinance until it's enforced, because the terms of the Ordinance are vague and ambiguous.



184. If boats similar to the above pontoon boat are not targeted for operating in a "bow-high manner" or an "artificially bow high manner," but the Ordinance targets wake boat operations as shown in Paragraph 179, above, then the Ordinance is unlawfully targeting and attempting to ban use of a wake boat. Across-the-board regulation by boat size, type of boat, or horsepower has been considered and is an unwarranted prohibition on public rights.

185. The Ordinance also attempts to ban an "increased" or "enhanced" wake but those terms are also undefined and no guidance is given to law enforcement to determine what, based on a view of the boat, constitutes an "increased" or "enhanced" wake.

186. The Ordinance also exempts from its prohibitions, a "brief transition operation" but that term is undefined. There are no guidelines, measurements, or other calculable basis for enforcement in the Ordinance to determine whether a "brief transition operation" is, whether that is measured in seconds, minutes, or distance, giving virtually complete discretion to law enforcement on whether to stop the boat and enforce the Ordinance.

187. The term "fin" is also undefined and provides no guidance on how to define that term and what constitutes a "fin."

188. The Ordinance's prohibition on ballast tanks, ballast bags, or so-called "fins" are features that are primarily internal to the boat, under the water's surface or the boat itself, and are not readily visible to a law enforcement officer to justify stopping a boat based on a visual observation. That leaves virtually complete discretion to pick and choose whether a boat is operating in a "bow-high manner," "artificially bow high manner," has an "increased" or "enhanced" wake, or "brief transition speed" in an attempt to arbitrarily and unlawfully stop it and engage in additional unlawful searches for use of ballast tanks, ballast bags, or so-called "fins."

189. There exists justiciable controversies between the parties.

190. The interests of the Plaintiff and Defendants are adverse.

191. Plaintiff has a legally protectable interest that is the subject of this controversy, and thus, in achieving a declaration of their rights and interests.

192. The issues involved in said controversy are ripe for judicial determination.

193. Further, if the issues presented are resolved by the Court, such resolution will end this controversy.

## COUNT IV
**(Violation of Title II of Americans with Disabilities Act – 42 U.S.C. § 12131)**

194. Plaintiff realleges all prior allegations.

195. Prior to the passage of the Ordinance, the Village Board was notified via letter from legal counsel and in at least one public meeting about the adverse impacts a wake surfing ban would have on people with disabilities and other physical infirmities and their ability to recreate on Elkhart Lake.

47

196. The Ordinance's purported complete ban on a low-impact watersport fails to make reasonable modifications or accommodations for persons with disabilities, including some of EWA's individually-identified members and one member's minor child, contrary to the clearly-established law under Title II of the Americans with Disabilities Act that "a public entity must reasonably accommodate a qualified individual with a disability by making changes in rules, policies, practices, or services when needed." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 782–83 (7th Cir. 2002).

197. Municipal ordinances qualify as a "public 'program' or 'service,' as those terms are employed in the ADA, and the enforcement of those rules is an 'activity' of a local government." *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 750 (7th Cir. 2006).

<u>**COUNT V**</u>
**(Declaratory Judgment under 28 U.S.C. §§ 2201-2202– Ordinance Violates Plaintiffs' Constitutional Rights to Substantive Due Process under the Fourteenth (14th) Amendment of the U.S. Constitution – 42 U.S.C. § 1983)**

198. Plaintiff realleges all prior allegations.

199. There exists justiciable controversies between the parties.

200. The interests of the Plaintiff and Defendants are adverse.

201. Plaintiff has a legally protectable interest that is the subject of this controversy, and thus, in achieving a declaration of their rights and interests.

202. The issues involved in said controversy are ripe for judicial determination.

203. Further, if the issues presented are resolved by the Court, such resolution will end this controversy.

48

**COUNT VI**

**(Declaratory Judgment under Wis. Stat. § 806.04 – Ordinance Violates Plaintiffs'
Constitutional Rights to Procedural Due Process under Art. 1, § 1 of the Wisconsin
Constitution)**

204. Plaintiff realleges all prior allegations.

205. There exists justiciable controversies between the parties.

206. The interests of the Plaintiff and Defendants are adverse.

207. Plaintiff has a legally protectable interest that is the subject of this controversy, and thus, in achieving a declaration of their rights and interests.

208. The issues involved in said controversy are ripe for judicial determination.

209. Further, if the issues presented are resolved by the Court, such resolution will end this controversy.

**COUNT VII**

**(Declaratory Judgment under Wis. Stat. § 806.04 – Ordinance Violates Plaintiffs'
Constitutional Rights to Substantive Due Process under Art. 1, § 1 of the Wisconsin
Constitution)**

210. Plaintiff realleges all prior allegations.

211. There exists justiciable controversies between the parties.

212. The interests of the Plaintiff and Defendants are adverse.

213. Plaintiff has a legally protectable interest that is the subject of this controversy, and thus, in achieving a declaration of their rights and interests.

214. The issues involved in said controversy are ripe for judicial determination.

215. Further, if the issues presented are resolved by the Court, such resolution will end this controversy.

49

## COUNT VIII
**(Declaratory Judgment under Wis. Stat. § 806.04 – Ordinance Constitutes Unconstitutional Violation (Equal Protection and Substantive Due Process) of Plaintiffs' Rights as Riparian Owners who Possess Riparian Rights)**

216. Plaintiff realleges all prior allegations.

217. Through the Ordinance's attempt to prohibit wake surfing – an otherwise legal and reasonable recreational use of the water in Wisconsin for riparian owners – the Village has deprived EWA's members of their rights as riparian property owners on Elkhart Lake to a reasonable means of recreation on Elkhart Lake.

218. EWA's members, as riparian owners on Elkhart Lake, have recognized constitutional rights as riparian owners to engage in recreational activities on their lakes, including boating. "It is clear in Wisconsin that the mere fact that one owns property abutting a natural body of water presumptively confers certain rights." *Mayer v. Grueber*, 29 Wis. 2d 168, 174, 138 N.W.2d 197, 203 (1965).

219. Riparian owners have "'***special rights*** to make use of water in a waterway adjoining an owner's property.' They are the 'bundle of rights' that may be conferred upon a property owner by virtue of his contiguity to a navigable body of water." *Movrich v. Lobermeier*, 2018 WI 9, ¶ 22, 379 Wis. 2d 269, 283-84, 905 N.W.2d 807, 813 (internal citations excluded) (emphasis added).

220. EWA members' riparian rights include "[t]he right to reasonable use of the waters for … recreational purposes." *Id*. at ¶ 22.

221. Riparian rights include the right to use a body of water "for bathing, swimming and boating purposes." *Bino v. Hurley* 273 Wis. 10, 16 (1956).

222. Such riparian rights are "substantial and valuable [] for which compensation must be given if the owner is to be deprived of [them]." A deprivation of riparian rights constitutes "the taking of property . . . without due process and without compensation. It violates the 14th

50

Amendment of the Federal Constitution and the provisions of sec. 13, art. 1, Wisconsin Constitution." *Id.*

223.    The Wisconsin Department of Natural Resources' "Guideline for Creating Local Boating Ordinances and Placing Waterway Markers in Wisconsin Waters" (PUB-LE-317-2016) states Villages must consider riparian owners' rights when enacting an ordinance under Wis. Stat. § 30.77. The Village did not do so here.

224.    There exists justiciable controversies between the parties.

225.    The interests of the Plaintiff and Defendants are adverse.

226.    Plaintiff, on behalf of its members, has a legally protectable interest that is the subject of this controversy, and thus, in achieving a declaration of their rights and interests.

227.    The issues involved in said controversy are ripe for judicial determination.

228.    Further, if the issues presented are resolved by the Court, such resolution will end this controversy.

### COUNT IX
**(Declaratory Judgment under Wis. Stat. § 806.04 – Ordinance is Arbitrary, Capricious, or an Abuse of Discretion and therefore Void and Illegal)**

229.    Plaintiff realleges all prior allegations.

230.    The Village unreasonably and unlawfully acted in an arbitrary and capricious manner when the Village used its so-called "local control" to enact a wake surfing ban on Elkhart Lake, the *fourth-deepest* natural lake in Wisconsin.

231.    The Ordinance itself contained no evidence in support of its generalized and overbroad "Whereas" clauses as specifically applied to Elkhart Lake.

51

232. Elkhart Lake *is 119-feet deep at its deepest point*. Elkhart Lake's *mean depth is 46 feet*. The map below makes clear that the majority of the lake's 292 acres has depths greater than 30 feet:



233. Incredibly, during the November 3 Meeting, Village President Lynn Shovan stated her basis for voting in favor of the Ordinance. After recognizing there were *no citations or accidents* on Elkhart Lake with wake boats, she said, "*But the damage from the downward propulsion is my biggest concern out of any of this.*" With no apparent evidentiary basis, and after wake surfing has occurred on Elkhart Lake for decades, Shovan then speculated that damage could occur decades down the road which would purportedly take decades to fix.

234. In a lake that is 119-feet deep and has a mean depth of 46 feet, there is no evidence in any literature or studies (even those biased or "paid for" studies to support wake surfing bans) that support Village President Shovan's so-called justification that wake boats' downward propulsion in Elkhart Lake would damage any portion of the lake bottom when they are operating in those deep sections of lake, as proposed by the Compromise Ordinance (discussed *supra*).

235. President Shovan's and the Village's exercise of so-called local control is the proverbial "Exhibit A" of an arbitrary and capricious decision, unsupported by the evidence, which entitles the Ordinance to being overturned. Such arbitrary decision making also illustrates the necessity of statewide intervention to ensure future ordinances and previously-enacted ones do not continue to overstep their legal authority.

236. Further, the Village, including one of its trustees, while blaming wake surfing for supposed impacts to the bottom, ignored the adverse impacts of non-wake boats, including pontoons, that operate within 200 feet of the shore and in the shallow areas of Elkhart Lake.

237. Inexplicably, use of those other non-wake surfing boats (which are presumably much more numerous than a handful of wake boats) are not targeted by the Village.

238. In a shallow bay, where wake surfing does ***not*** occur (and was not proposed to occur through the Compromise Ordinance, discussed *supra*), but where pontoon boats are known to regularly traverse, e.g., leading to and from a Village Trustee's waterfront property, scarring of the lake bottom (potentially destroying fish beds) clearly occurs:



2025 Aerial Image, Sheboygan County GIS, showing clear lake bottom scarring from non-wake boat use to and from a Village Trustee's property in a shallow bay where wake surfing does not occur and was not proposed to occur under the Compromise Ordinance. In addition to the clear paths showing lake bottom scarring from a non-wake boat (likely a pontoon), use of an outboard motor near the boat lift shows the apparent cratering that occurs from onloading and offloading of that pontoon onto the lift through the use of that boat's outboard motor.

239. And yet, even with that type of evidence of lake bottom scarring from other boats, it is wake boats' operation on Elkhart Lake which the Village believes warrant a complete ban, especially in the deep waters of Elkhart Lake.

240. As is readily evident from the size and depth of Elkhart Lake, it has the capacity for wake surfing and all different types of users. Prior to passage of the Ordinance, one Village Trustee who sought the ban (and who voted in favor of the Ordinance, but did not speak during the discussion of the Ordinance at the November 3 Meeting) admitted in an email, "Elkhart - *from a size and depth perspective* - could see use of wake boats continue." Despite that admission, that

Trustee still sought to find excuses to ban wake surfing even when the facts did not meet his personal desires.

241. During the November 3 Meeting, another Trustee conceded the obvious (which contradicted the Village President's earlier statement regarding downward propulsion), stating: "***We're a deep lake.***"

242. In a misguided attempt to justify the Ordinance's complete ban, that Trustee then proceeded to say: "We're not a huge lake, I mean, we're a deep lake but we're not a huge lake." ***Elkhart Lake's 292 acres is the equivalent of approximately 221 Lambeau Fields***. Rather than accommodate and allow wake surfing for a handful of wake boats with reasonable restrictions on a lake that is the equivalent of 221 football fields, the Village completely banned wake surfing and targeted wake boats with its Ordinance.

243. There have been no safety issues cited or document by the Village of Elkhart Lake regarding wake surfing. One Trustee (who voted in favor of the Ordinance but did not speak during the discussion of the Ordinance at the November 3 meeting) in February 2025 admitted to the Village Police Chief that, "I see ***we have not in this nor the recent past years had any issues with wake surfing incidents.***"

244. The year prior, in 2024, Defendant Schott in an apparent attempt to "build a case" regarding wake boating being an issue on Elkhart Lake to support an Ordinance, asked about wake boat impacts and concerns. On June 28, 2024, Schott emailed Village Administrator Jessica Reilly, "Is the village getting calls concerning wakeboats and their impact on the lake/lake users?" Reilly replied minutes later, "*I have not gotten any and I asked Mike [the Village Police Chief who performs water patrols] and they haven't heard anything either*."

245. A Village Trustee (who voted in favor of the Ordinance but did not speak during the discussion of the Ordinance at the November 3 meeting) in February 2025 also recognized wake surfing had been a non-issue on Elkhart Lake, as he admitted, "***we have had no complaints registered with the village office or the police department***, we have had no citations or warnings given out due to wake surfing in the last few years."

246. The lack of citations or warnings goes back further than the "last few years." On February 20, 2025, the Village Trustee (who voted in favor of the Ordinance but did not speak during the discussion of the Ordinance at the November 3 meeting) emailed the Village's Police Chief and said, after reviewing a summary of citations ***from 2012 through 2023***, "As I look at the summary through 2023 ***<u>I do not see any listed infractions or warnings involving wake surfing</u>***. And, I guess, the department/village ***has few if any complaints officially registered concerning wake surfing*** but I wanted to check." There was no response email from the Police Chief disputing that conclusion.

247. Defendant Schott sent a text message to a member of the public in June 2024 further acknowledging the lack of issues that wake surfing boats created. In that text message, Schott admitted, "I checked and the village has had no call concerning WB. Perhaps ***things are OK as is, and there is no need to change how people are operating***."

248. During the Village Board's November 3 Meeting, prior to passage of the Ordinance by the Board, Village President Lynn Shovan appeared to understand that the safety issues were not a legitimate basis to deny the use of wake boats and wake surfing, based on the lack of issues on Elkhart Lake. She stated, "***It has nothing to do with, um, tickets being issued or even in my eyes, safety. There have been no accidents with these boats. I understand that.***" That is an incredible admission.

249. Records requests were made to the Village for any citations issued pursuant to Wis. Stat. § 30.68(4)(a) on Elkhart Lake, which provides that, "No person shall operate a motorboat so as to approach or pass another boat in such a manner as to create a hazardous wake or wash." Similarly, records requests for any citations related to violations of Wis. Stat. 30.66(3)(a), (ar) or (b) related to speed and use of boats in proximity to the shoreline, other boats, and other structures on Elkhart Lake were also requested. The records requested covered the dates of January 1, 2020 through October 28, 2025.

250. After providing records responsive to the above requests for citations, upon information and belief, the citations revealed the Village of Elkhart Lake has issued *zero citations* to wake boats involved with wake surfing. (From 2020 through 2025 there has only been *one* citation for a "hazardous wake or wash" and that was issued to an unlisted/unknown boat from Illinois.)

251. Further, a request was made to the Village for a copy of all citations issued for violations of the "no wake" requirement within 200 feet of Elkhart Lake's shoreline from the date of January 1, 2020 to October 30, 2025. Based on the records provided by the Village, of the approximately 55 citations issued for violations of that 200-foot shoreline setback ordinance, *none* of the citations were issued to EWA's members while using a wake boat for wake surfing and there is no indication on the citation forms provided that any citations were issued for wake boat operation. Nonetheless, the Village maintains that wake boats and wake surfing is the problem that needs to get prohibited on Elkhart Lake.

252. Despite the lack of citations, the Village – contrary to the evidence specific to Elkhart Lake – passed a complete ban on a legal watersport – wake surfing.

57

253. Further, the Ordinance arbitrarily and capriciously targets one particular type of boat (wake boats) and activity (wake surfing) but expressly exempts activities such as water skiing, tubing, and wake boarding even though those activities engage in the same prohibited operations that wake surfing does. Water skiing, tubing, and wake boarding, especially when training youth to engage in such activities, occur at slower speeds and create waves equal to or greater than a wave created by a wake boat when wake surfing.

254. For example, when tubing, safe speeds for youth are 8-12 miles per hour. When engaging in tubing or other recreational uses, those other non-wake boats generate wave heights averaging 11 inches and as high as 17 inches at just 100 feet from the boat.

255. If wave size is the basis to prohibit wake surfing, the Village is arbitrarily and capriciously targeting wake boats and wake surfing, and ignores the results of the Elkhart Wake Study.

256. If speed of the activity is the concern, the Village's action is arbitrary in allowing high speed activities like water skiing, tubing, and wakeboarding (which can operate speeds of up to 25-30 miles per hour), but prohibiting slow speed activities like wake surfing (which typically operates at speeds of 10-12 miles per hour).

257. If aquatic invasive species ("AIS") is the concern, the Village is not enacting prohibitions on the use of other equipment on other types of boats that can transport water and potentially invasive species from lake to lake, such as live wells, bilge pumps, outboard motors, and stern drive motors, which all can retain some level of water and aquatic invasive species.

258. As it pertains to AIS, the Wisconsin Department of Natural Resources has extensively studied the issue and found such claims relating to wake boats spreading AIS lack any merit.

259. During a January 28, 2026 presentation to the Natural Resources Board ("NRB"), in response to a petition requesting WDNR make rules regarding AIS and wake boats (denying the petition to single out wake boats), WDNR Deputy Secretary Steven Little stated the following, in relevant part:

a. "In spite of what you've heard over the past several years from individuals and organizations who have come before the NRB, while ballast systems retain water, *the research has not demonstrated that wake boats uniquely or disproportionately drive AIS spread compared to other watercraft.*"

b. "If you *only have a hammer as a tool, then everything looks like a nail* to you….[wake boat opponents] will only be satisfied if the Department uses a hammer, *even if the use is not supported by the science, statutory authority, or effective enforcement or desired outcomes.*"

c. Petitioner contends wake boat use has caused or accelerated the spread of AIS, but "available research and long-term monitoring data do not support this claim. In fact, *trends over the past decade indicate a decline in the number of newly infested lakes suggesting that existing AIS prevention and management programs are effective.*"

d. "AIS vectors and species were present in Wisconsin lakes well before wake boats became prevalent. And like I said, the Department's monitoring data does not show a discernible increase in the number of lakes with verified infections of spiny water fleas, zebra mussels, or Eurasian Water Milfoil coinciding with the growth of wake boat use beginning in the 2010s."

59

e. The prospect of harboring veligers for zebra mussels is common across all powerboat types and "*is not unique to wake boats and does not by itself demonstrate an elevated risk of invasion or infection specific to the ballast systems of these watercraft.*"

f. "The *available data is insufficient to quantify relative invasion risk or conclude that wake boats materially increase AIS spread*."

260. Deputy Secretary Little, near the conclusion of his presentation to the NRB, noted "*putting an unenforceable rule on the books is probably worse than doing nothing at all*. It creates this expectation that we are going to be able to do something about a problem when you don't have the resources or have the enforcement regime to actually solve the problem and it creates this false expectation that the problem is being solved." And yet, creating an unenforceable rules is what the Village has done here with their Ordinances.

261. For EWA's members' wake boats, their boats do not travel from lake to lake and remain on Elkhart Lake during the open water season. They do not and cannot transport aquatic invasive species from lake-to-lake, but EWA's members, especially those that are riparian owners, appear to be prohibited from wake surfing.

262. If there is a generalized concern about wakes being dangerous from wake surfing, in addition to there being concessions that no safety issues had been reported or existed as admitted to by the Village President when she said, "*It has nothing to do with, um, tickets being issued or even in my eyes, safety. There have been no accidents with these boats. I understand that,*" the Village was made aware State Statutes already prohibit dangerous boat operations and hazardous wakes through existing, enforceable state laws, and such additional regulations through the Ordinance are arbitrary, capricious, and unreasonable in light of existing laws.

60

263. Plaintiff anticipates the Village will attempt to rely on a "condition report" to justify the Ordinance, but that reliance is fatally flawed from the start.

264. The Village Board, upon information and belief, did not discuss, approve, or adopt the so-called "condition report" as part of its discussions leading up to and through the time of the Ordinance's passage. No Village Board meeting minutes reflect that the Board considered or adopted this so-called "condition report."

265. Upon information and belief, the Village Board or Village staff did not assemble and prepare the so-called "condition report" (nor, upon information and belief, did the Village Board seek to revise or otherwise adjust the content of the report).

266. Even if there was evidence the Board discussed the condition report in open session (there is no known evidence they did), the condition report was not drafted to accurately assess the conditions on Elkhart Lake so that the Board could make an informed, rational judgment, ***but was done on the condition that the Village adopt a complete ban on wake surfing.*** That is, the special interest advocacy organization that drafted the condition report pledged to do the "paperwork" and would draft a one-sided condition report for the sole purpose of enacting a ban, not to truly assess Elkhart Lake's conditions and the lack of impacts that wake surfing has on Wisconsin's fourth-deepest natural lake.

267. Village Trustee Schott said, as part of an information packet to a Village Committee, that the outside organization would help with the condition report "***[o]nly if we are prohibiting wake surfing.***" Trustee Schott's information in the packet also said, "***If we want to establish a "depth and distance" restriction, they [the outside organization] will not***" help draft a condition report (emphasis added).

268. In a February 11, 2025 text message from Defendant Schott to Village Administrator Reilly, Schott stated, "We can get help in writing [the condition report] from [the outside group] IF the board decides to propose eliminating wake surfing. If we decide to use a distance from shore and depth regulation, they are not interested in helping us. They are focusing on lakes that are trying to prevent wake surfing completely." (emphasis in original).

269. With statements like those and support conditioned on enacting a ban instead of reasonable restrictions, it is no wonder the so-called "condition report" is as one-sided and biased as it is against wake surfing. It omits substantial, meaningful, verifiable data and facts about Elkhart Lake that does not support a ban. It omits scientific data and reporting contradictory to or that does not support claims made within the report. Furthermore, this report does not consider that there are boats on Elkhart Lake that do not use wake enhancement devices but create similar wakes while pulling tubers or skiers, and yet these types of boats and activities are not being regulated. Further, evidence that the preparer(s) of this report have appropriate credentials or qualifications to perform an unbiased scientific assessment of Elkhart Lake is absent.

270. The *quid pro quo for the condition report attempted to lock in, and apparently did lock in, the result before the vote and further evidences the arbitrary and capricious nature of the Village's decision* regarding the Ordinance, in which the Village made a Faustian bargain: The Village gives up its independent, rational judgment to allow for reasonable restrictions of wake surfing in a 119-foot deep lake, and in exchange, the outside interest group will "help [the Village] prepare the paperwork," including the condition report, to get that pre-determined, complete prohibition via the Ordinance.

271. The Village produced no evidence during the passage of its Ordinance which justified the Ordinance as enacted.

272. There exists justiciable controversies between the parties.

273. The interests of the Plaintiff and Defendants are adverse.

274. Plaintiff has a legally protectable interest that is the subject of this controversy, and thus, in achieving a declaration of their rights and interests.

275. The issues involved in said controversy are ripe for judicial determination.

276. Further, if the issues presented are resolved by the Court, such resolution will end this controversy.

**<u>COUNT X</u>**
**(Declaratory Judgment under Wis. Stat. § 806.04 –Violation of Plaintiffs' Rights Under the Public Trust Doctrine – Article IX, § 1 of the Wisconsin Constitution)**

277. Plaintiff realleges all prior allegations.

278. Article IX, § 1 of the Wisconsin Constitution enshrines legally protectable interests to Wisconsin's waters, which is known as the Public Trust Doctrine.

279. Article IX, § 1 of the Wisconsin Constitution provides, Wisconsin's waters, including its lakes, "shall be common highways and forever free."

280. Under the Public Trust Doctrine, "the right of the citizens of the state to enjoy our navigable streams for recreational purposes . . . is a legal right that is entitled to all the protection which is given financial rights." *Muench v. Public Serv. Comm'n*, 261 Wis. 492, 511-12, 53 N.W.2d 514, 522 (1952).

281. Under the Public Trust Doctrine, regulations or ordinances impacting the use of Wisconsin's waters "must be balanced and accommodated on a case by case basis." *State v. Vill. of Lake Delton*, 93 Wis. 2d 78, 96, 286 N.W.2d 622, 632 (Ct. App. 1979).

282. Under the Public Trust Doctrine, the Ordinance must "confine[] its remedy to the precise outlines of the need addressed" and "[i]ts effect on the rights of others [i.e., Plaintiffs"]"

63

must be "negligible," but the Ordinance's *prohibition* does not meet those requirements. *Id.* at 105-06.

283. With the recognized constitutional rights in mind, either as riparian owners or pursuant to the Public Trust Doctrine, the Village Ordinance's *prohibition* on a recreational activity is not a narrow or reasonable tailoring of a restriction, does not confine its remedy to the precise outlines of the need addressed, is not balanced, and does not accommodate Plaintiffs as riparian owners.

284. Riparian rights or rights under the Public Trust Doctrine are fundamental rights and strict scrutiny applies, and the Ordinance must be narrowly tailored to serve a compelling governmental interest. The Ordinance must be the least restrictive means to achieve that end and complete prohibitions do not satisfy that standard. There are less discriminatory methods to achieve any desired objectives or goals that the Village bypassed.

285. Alternatively, if these rights are something other than fundamental rights, the Village's Ordinance fails to further an important governmental interest and does not do so by a means that is substantially related to that interest, especially with the carve-outs for other recreational uses that present the same issues the Village purports to address with wake boats.

286. Alternatively, the Ordinance is arbitrary and capricious.

287. There exists justiciable controversies between the parties.

288. The interests of the Plaintiffs and Defendants are adverse.

289. Plaintiff has a legally protectable interest that is the subject of this controversy, and thus, in achieving a declaration of their rights and interests.

290. The issues involved in said controversy are ripe for judicial determination.

291. Further, if the issues presented are resolved by the Court, such resolution will end this controversy.

**COUNT XI**
**(Ordinance Constitutes a Per Se Regulatory Taking of EWA Members' Personal Property and Violates Plaintiff's Members' Constitutional Rights Under Fifth Amendment of the U.S. Constitution– 42 U.S.C. § 1983)**

292. Plaintiff realleges all prior allegations.

293. In the event the Ordinance is upheld, the Ordinance's prohibitions constitute an unduly onerous regulation and constitute a per se regulatory taking of EWA members' personal property.

294. The Ordinance is a regulation which goes "too far" in burdening the personal property rights of EWA's members.

295. Each of EWA's members owns personal property, as set forth in Exhibit C of this Complaint. EWA's members have purchased equipment specific to, and with the expectation that they would be allowed to continue engaging in wake surfing on Elkhart Lake.

296. As set forth in Exhibit C, Equipment purchased by EWA's members includes, but is not limited to boats with ballast tanks that cannot be removed, ballast bags, wave shaping devices, and boat lifts to expressly support their respective boats to be housed on Elkhart Lake when not in use.

297. The Ordinance's attempt to ban ballast tanks, ballast bags, or fins constitute per se regulatory takings and just compensation is due.

298. For example, the McComis Boat, as is the case with many modern high performance boats, utilizes wake shaping fins in all speeds and activity ranges. The operator of the boat cannot turn this system off within reason and it automatically engages when the boat itself deems necessary. The fin system will adjust the pitch of the bow when skiing, wakeboarding, and

65

cruising to keep the bow at a constant angle, but it is primarily meant to dig the bow into the water in tight turns or help the boat get on plane faster, but it still automatically engages. The Ordinance effectively prohibits McComis from using his wake boat, even from activities exempted by the Ordinance, because the fin system automatically engages when the boat is in operation.

299. The Ordinance, if upheld, denies all economically beneficial or productive use of EWA members' personal property as set forth in Exhibit C, and just compensation is required. *See Lucas v. South Carolina Coastal Council,* 505 U. S. 1003 (1992).

300. Just compensation is required to be paid in an amount of not less than $1,799,993.83 to EWA's members.

## COUNT XII
**(Ordinance Constitutes a Regulatory Taking of EWA Members' Personal Property and Violates Plaintiff's Members' Constitutional Rights Under Fifth Amendment of the U.S. Constitution– 42 U.S.C. § 1983)**

301. Plaintiff realleges all prior allegations.

302. The Ordinance has an adverse economic impact on EWA's members. In addition to the taking of their property, if the Ordinance is upheld, it will require EWA's members to find another place to dock their boats, with such costs docking fees on another waterbody being no less than $2,169.90 per month, per 30-foot boat slip, per each member's wake boat, totaling $151,893.00 for the summer 2026 (May through September for 14 boats), plus amounts in the future years dock the boats.

303. In purchasing the personal property for use on Elkhart Lake, the Ordinance's attempt at complete prohibitions goes "too far" and interferes with the reasonable, distinct, investment-backed expectations to use such equipment in an otherwise reasonable, legal manner on Elkhart Lake, as wake surfing is an otherwise legal watersport under Wisconsin law, has

66

occurred for decades on Elkhart Lake, and water regulations must be "balanced", not a complete ban.

304. The character of the Ordinance is overbroad and sweeping. Rather than engaging in reasonable restrictions limiting the personal property's use to certain times, days, or areas of the lake, the Ordinance purports to completely ban use of EWA members' personal property.

305. Just compensation and damages are due to EWA's members.

## COUNT XIII
**(Ordinance Constitutes a Per Se Regulatory Taking of EWA Members' Personal Property and Violates Plaintiff's Members Constitutional Rights Under the Just Compensation Clause of Article 1, § 13 of the Wisconsin Constitution– 42 U.S.C. § 1983)**

306. Plaintiff realleges all prior allegations.

## COUNT XIV
**(Ordinance Constitutes a Regulatory Taking of EWA Members' Personal Property and Violates Plaintiff's Members Constitutional Rights Under the Just Compensation Clause of Article 1, § 13 of the Wisconsin Constitution– 42 U.S.C. § 1983)**

307. Plaintiff realleges all prior allegations.

## COUNT XV
**(Declaratory Judgment under Wis. Stat. § 806.04 – Ordinance Violates Consistency Requirement with Wis. Stat. §§ 30.60-30.71)**

308. Plaintiff realleges all prior allegations.

309. The Ordinance is prohibited from conflicting with Wis. Stat. §§ 30.60-30.71.

310. Section 2 of the Ordinance also requires wake boat operators to operate at high speeds, discouraging a slower transition speed for some undefined "brief" time, regardless of water conditions or the safety of others around them. The Ordinance also requires boat operators to operate in a careless, negligent or reckless manner which may endanger the operator's life, property or person or the life, property or person of another in order to comply with the Ordinance's attempts to prohibit slow speeds.

67

311. Such Ordinance requirements are contrary to the health, safety, and welfare of the public.

312. Such Ordinance requirements are contrary to Wis. Stat. § 30.66(1), which requires, "No person shall operate a motorboat at a speed greater than is reasonable and prudent under the conditions and having regard for the actual and potential hazards then existing. The speed of a motorboat shall be so controlled as to avoid colliding with any object lawfully in or on the water or with any person, boat or other conveyance in or on the water in compliance with legal requirements and exercising due care."

313. There exists justiciable controversies between the parties.

314. The interests of the Plaintiff and Defendants are adverse.

315. Plaintiff has a legally protectable interest that is the subject of this controversy.

316. The issues involved in said controversy are ripe for judicial determination.

317. Further, if the issues presented are resolved by the Court, such resolution will end this controversy.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, Elkhart Watersports Alliance, Inc., requests judgment be entered in their favor and against the above-named Defendants as follows:

A. A declaratory judgment and declaration of interests and rights.

B. An injunction and order enjoining Defendants from enforcing its Ordinance;

C. Nominal damages in the amount of $1. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021).

D. An award of actual, compensatory, or other damages to be determined by the Court, together with interest, including but not limited to: compensation or damages of no

68

less than $1,799,993.83 for the loss of use and taking of EWA members' personal property; docking fees on another waterbody, of no less than $2,169.90 per month, per 30-foot boat slip, per each member's wake boat, totaling $151,893.00 for the summer 2026 (May through September for 14 boats), plus a sufficient amount of damages to ensure similar ongoing payments in perpetuity until the Ordinance is no longer in effect and the members no longer own their respective wake boats, with such payment for future years beyond 2026 totaling no less than $759,465.00 to cover the next five (5) years of docking fees after 2026, plus an amount to be determined which is sufficient to cover the increased cost of docking fees not yet known to; and emotional distress damages (50% of economic damages) – $1,355,675.91.

E. An award and order directing Defendant to pay Plaintiffs' attorneys' fees, costs, and disbursements in this action, including but not limited to fees due under 42 U.S.C. § 1988; and

F. For such other relief as the Court deems just and equitable.

Dated this 20th day of April, 2026.

WELD RILEY, S.C.

By: *s/ Anders B. Helquist*
Anders B. Helquist
WI State Bar # 1070854
Weld Riley, S.C.
3624 Oakwood Hills Parkway
Eau Claire, WI 54701
715-839-7786
ahelquist@weldriley.com
*Counsel for Plaintiff,*
*Elkhart Watersports Alliance, Inc.*

69